N.C., A Child Under Eighteen, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000271–DG.

Supreme Court of Kentucky.

April 25, 2013.

Robert Kenneth Strong, Kentucky Department of Public Advocacy, Renee Sara Vandenwallbake, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellant.

Jack Conway, Attorney General, Terry Lane Geoghegan, Commonwealth Attorney, John Samuel Kelley V, Special Asst. Attorney General, Bardstown, KY, for appellee.

Opinion of the Court by Justice NOBLE.

This case is before the Court on the question of whether N.C., a juvenile, is entitled to suppression of a confession in which he admitted giving hydrocodone to another student. The statement was made directly in answer to questions from the school assistant principal, who was working in conjunction with a deputy sheriff (School Resource Officer) who was also present. The School Resource Officer did not read the juvenile his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This Court recognizes that questioning by school officials is relevant and necessary to student discipline and safety, and that such matters are not impacted by *Miranda* when only school discipline is involved. But this Court holds that any incriminating statements elicited under the circumstances of this case, with a school official working with the police on a case involving a criminal offense, the police failing to give *Miranda* warnings, and the juvenile being in custody, are subject to suppression under the Unified Juvenile Code and the Fifth Amendment. With this rule in mind, the Court concludes that N.C. was in custody when he was questioned and that his statements must be suppressed.

## I. Background

A teacher at Nelson County High School found an empty prescription pill bottle for hydrocodone with N.C.'s name on it on the floor in the boy's bathroom. He turned this in to the school office, and the occurrence was investigated to some degree before N.C. was questioned. Steven D. Campbell, a Nelson County deputy sheriff assigned to the high school as the School Resource Officer (SRO), testified at the suppression hearing in this case that the assistant principal, Michael Glass, knew that N.C. had given some pills away before he and the assistant principal went to N.C.'s classroom and took him out of class. Both the officer and the assistant principal knew that the prescription was for hydrocodone based on the bottle that was found. They also knew the name of the student who brought the pill bottle to the school,

also based on the information on the bottle.

N.C. was taken into the office by the assistant principal and the SRO, and the door was closed. The assistant principal first asked N.C. if he had any idea why he was there; N.C. said he did not. Also according to the SRO's testimony, the assistant principal then told N.C. about the pill bottle, and N.C. said, "I did something stupid." The assistant principal explained about finding the bottle in the boy's bathroom, and said that "it was told that he [N.C.] had given some pills away." N.C. then admitted that he had given two pills to a friend of his, explaining that he had had his wisdom teeth removed, and that the prescription was for pain. The assistant principal asked him how many pills he had brought, and N.C. admitted to having three, one of which he had taken and two that he had given to the other student. He also told the assistant principal that the other student had been insistent about N.C. giving him some pills. The assistant principal told N.C. that he was subject to school discipline (in fact he was subsequently expelled). He then left to check on the other student while the SRO told N.C. that he would be charged with a crime and explained the criminal consequences.

The assistant principal admitted at the suppression hearing that he knew how the SRO operated in criminal investigations, since this was not their "first go around" interrogating juveniles together. The officer also testified about what the assistant principal usually did in questioning a student in the officer's presence. Clearly, the assistant principal and the officer had a loose routine they followed for questioning students when there was suspected criminal activity.

The SRO further testified that he was present throughout, and participated in the discussion. He was either wearing his uniform or a shirt that said "Sheriff's Office," and was armed with a gun. He was assigned to the high school from the sheriff's office, and had been there daily for the last four years. It was his decision to file charges against N.C. At no time did the SRO tell N.C. that he was free to leave or give him any version of the *Miranda* warnings, though the officer obviously understood that the hydrocodone was a scheduled narcotic, as evidenced by the charges he filed in juvenile court. He did tell N.C. and his mother that N.C. would be charged criminally, both when N.C.'s mother was called and when she came to pick him up from school and was given a copy of the citation. At the time, it was school policy to send an accused student home, and proceed with any charges in the juvenile court.

N.C. was charged with possessing and dispensing a controlled substance, a Class D felony, in a juvenile petition under KRS 610.010. In the juvenile petition, the officer stated that N.C. "has admitted to the affiant to giving two (2) of his prescription pills (Hydrocodone, Schedule II drug for pain relief) to another student at Nelson County High School."

The official Preliminary Inquiry form used by the court-designated worker, Monica Felty, indicated that N.C. was "classified" as a Youthful Offender because he had attained age 16 at the time of the commission of this offense and had been previously adjudicated as a Public Offender for the felony offense of third-degree burglary.

After hearing testimony, the trial court denied N.C.'s motion to suppress. On December 28, 2009, N.C. entered a conditional guilty plea to the charge, reserving the right to appeal the denial of his motion. Because he had turned 18 prior to the disposition date of February 28, 2010, N.C.

was sentenced to 45 days in jail, 30 hours of community service, and an additional 27 hours of community service in lieu of court costs. This sentence was stayed pending any appeals. He appealed to the Nelson Circuit Court, which affirmed the lower court decision. A timely motion for discretionary review was filed at the Court of Appeals, which denied review. N.C. then filed for discretionary review at this Court, which was granted on February 15, 2012.

## II. Analysis

■ The issue before the Court is whether a student is entitled to the benefit of the *Miranda* warnings before being questioned by a school official in conjunction with a law enforcement officer, the SRO, when he is subject to criminal charges in district court or, as in this case, adult felony charges in circuit court. The SRO, a deputy sheriff assigned to the school in a full-time capacity by the local sheriff's office, participated in the process by going with the assistant principal, taking the student out of class, escorting him to the principal's office, and was present in a closed room while the assistant principal questioned the student. He summed up the result of the questioning, charged the student with a Class D felony, and issued a citation on the spot.

This is a highly relevant and far reaching question that presents a nexus between the rights of a juvenile accused of a crime and the needs of school officials to maintain order in the schools and protection for the other children in their care on the school premises or during school activities. Even though most of the law which governs these questions has been applicable for some time, the framing of the questions has changed over time with the advent of increased criminal activity by students in the school setting and local law enforcement officers being assigned to and working daily in the schools.

### A. When *Miranda* applies

*Miranda* established a two-part threshold before the warnings are required. Setting up the analysis, the Court first stated "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. The Court then clarified that "custodial interrogation ... mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* The referenced procedural safeguards are the well-known warnings. Thus the two-step threshold requires both questioning by law enforcement and being held in custody. When it is the police or other law enforcement officer who is doing the questioning, the first threshold is obviously met.

But since the rule was set out in *Miranda*, the Court has held that in some situations persons who are not law enforcement will be treated as such for *Miranda* purposes. In *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), an IRS agent obtained incriminating statements from a defendant in-custody for other reasons without giving him the *Miranda* warnings in the course of a routine civil tax investigation. Noting that such routine questioning frequently could lead to criminal charges, the Court found that the threshold for giving *Miranda* warnings had been met because the defendant's freedom was restrained (he was in jail and not free to leave) and the IRS agent was acting as law enforcement by asking the questions which led to his criminal charges. *Id.* at 4, 88 S.Ct. 1503.

856

We have followed this reasoning in *Buster v. Commonwealth*, 364 S.W.3d 157 (Ky. 2012), where we held that a non-law enforcement person was acting on behalf of or in concert with police to obtain a confession and thus *Miranda* warnings were required. When police could not obtain a statement from a mentally challenged suspect, they engaged a social worker, whom the suspect knew well and trusted, to question her and turn the information over to them. This made the questioning "indistinguishable from the police investigation," and therefore the social worker was "subject to the same constraints as a police officer." *Id.* at 164–65; *see also Hartsfield v. Commonwealth*, 277 S.W.3d 239, 245 (Ky.2009) (finding that a SANE nurse's interview was the "functional equivalent of police questioning").

And, pertaining specifically to a juvenile defendant, the federal district court for the Northern District of Indiana has held that when a school principal questioned a child with *no law enforcement present, the principal was not acting on behalf of law enforcement, and the child was never subjected to criminal charges,* the absence of law enforcement involvement is a significant factor that demonstrates when *Miranda* warnings are not implicated. That the law enforcement issue was noted indicates that had the principal been acting on behalf of law enforcement, the consideration would have been different. *C.S. v. Couch*, 843 F.Supp.2d 894, 918–19 (N.D.Ind.2011).

Thus the "law enforcement" requirement in *Miranda* may be contextual, or more related to function than to title.

 The second threshold question—whether a person is in custody—is an objective inquiry. At its most basic, custody requires a formal arrest or restraint on the subject's freedom of movement comparable to a formal arrest. *Thompson v.*

*Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). This requires a court to determine the circumstances surrounding the interrogation and, given those circumstances, to decide whether a reasonable person would believe he could terminate the interrogation and leave. *J.D.B. v. North Carolina*, —— U.S. ——, 131 S.Ct. 2394, 2402, 180 L.Ed.2d 310 (2011). Law enforcement and courts have been directed to examine all the circumstances surrounding the interrogation. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).

But it should be noted that the giving of *Miranda* warnings does not create a failsafe for the admissibility of the statement obtained. Even then, admissibility of the statement may be challenged on the ground that the statement was not voluntarily given. But the absence of *Miranda* warnings, when required, does make statements inadmissible.

This question was addressed in *Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), and is most commonly referred to as the "voluntariness" question. In *Fikes*, a pre-*Miranda* case, the defendant was sentenced to death for burglary with intent to commit rape. When he was arrested, he was questioned for over two hours, then was taken to a jail in another county and held for over two weeks without appearing in court. While he was held, he was kept in total segregation, and was not allowed the visits of family or his lawyer. During that time, he was interrogated repeatedly until he gave his first oral confession five days into the questioning, and signed a written one in the second week of being held. He had limited mental ability. Focusing on whether his confession could be deemed voluntary under the circumstances, the Supreme Court found that due process had been violated, and upheld the state supreme court's deci-

sion to reverse and order suppression of the confessions.

*Miranda* followed in 1966 and made statements obtained from a custodial interrogation by law enforcement inadmissible if the suspect had not been informed of his right to counsel and right to remain silent. Obviously, if *Miranda* warnings are given, this augurs toward the statements being voluntary, though that is not the end of the inquiry. Several years later in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), a case involving the voluntariness of a consent to search, the Supreme Court adopted the meaning of voluntariness used in the previous confession cases. In establishing how voluntariness could be determined, the Court laid out a "totality of the circumstances" test which viewed knowledge of the right to refuse consent as a factor. The Court carefully distinguished the Fourth Amendment search rights from the Fifth Amendment right not to incriminate oneself, and stated: "The Constitution requires that every effort be made to see to it that a defendant in a criminal case has not unknowingly relinquished the basic protections that the Framers thought indispensable to a fair trial." *Id.* at 242, 93 S.Ct. 2041. Nonetheless, this "totality of the circumstances" test has been adopted in determining voluntariness, with a more demanding standard in criminal cases placed on defining voluntariness of self-incrimination, which includes the giving of *Miranda* warnings, in custodial interrogations by law enforcement.

**B. The custody aspect of *Miranda* in juvenile cases**

In the landmark case *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the United States Supreme Court reviewed the development of juvenile legal issues to that point in time, stating:

From the inception of the juvenile court system, wide differences have been tolerated—indeed insisted upon—between the procedural rights accorded to adults and those of juveniles. In practically all jurisdictions, there are rights granted to adults which are withheld from juveniles. In addition to the specific problems involved in the present case, for example, it has been held that the juvenile is not entitled to bail, to indictment by grand jury, to a public trial or to trial by jury. It is frequent practice that rules governing the arrest and interrogation of adults by the police are not observed in the case of juveniles.

*Id.* at 14, 87 S.Ct. 1428. After recapitulating the history and theory underlying the development of juvenile courts as a system distinct from adults, the Court went on to opine:

Accordingly, the highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context. The constitutional and theoretical basis for this peculiar system is—to say the least—debatable.... The absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established principles of due process have frequently resulted not in enlightened procedure, but in arbitrariness.

*Id.* at 17–18, 87 S.Ct. 1428.

Stating that "[d]ue process of law is the primary and indispensable foundation of individual freedom," *id.* at 20, 87 S.Ct. 1428, the Court concluded:

Certainly, ... the high crime rates among juveniles to which we have referred could not lead us to conclude that the absence of constitutional protections reduces crime, or that the juvenile system, functioning free of constitutional

inhibitions as it has largely done, is effective to reduce crime or rehabilitate offenders. We do not mean to denigrate the juvenile court process or to suggest that there are not aspects of the juvenile system relating to offenders which are valuable. But the features of the juvenile system which its proponents have asserted are of unique benefit will not be impaired by constitutional domestication.... There is no reason why the application of due process requirements should interfere with such provisions.

*Id.* at 22–24, 87 S.Ct. 1428 (citation omitted).

The issue in *Gault* that is pertinent to the present case specifically concerned the questioning of the child once out of court and twice in court, and obtaining a confession without informing him of his privilege against self-incrimination under the Fifth Amendment to the United States Constitution. This warning is embodied in what is commonly referred to as "*Miranda* warnings."[1]

The *Gault* majority analyzed a common view at the time that the policy of juvenile justice was designed 'to hide youthful errors from the full gaze of the public and bury them in the graveyard of the forgotten past' and called it "more rhetoric than reality." *Gault,* 387 U.S. at 24, 87 S.Ct. 1428. The Court disposed of the notion that the juvenile judge should exercise lax procedures because this allowed the judge to give "paternal advice and admonition," *id.* at 26, 87 S.Ct. 1428, by saying that the appearance and actuality of fairness, impartiality and orderliness may be a more

impressive and therapeutic approach, because otherwise the child may feel that he is not being fairly treated, and thus will resist therapeutic efforts. The Court held in conclusion that the essentials of due process and fair treatment must be a part of juvenile proceedings.

And, further, the Court concluded that the reality of what a child experiences from the juvenile process when being adjudicated guilty of a public offense is that the child can be committed to a public institution "where he may be restrained of liberty for years." *Id.* at 27, 87 S.Ct. 1428. The Court stated further:

The fact of the matter is that, however euphemistic the title, a 'receiving home' or an 'industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes a building with whitewashed, regimented routine and institutional hours. Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees and 'delinquents' confined with him for anything from waywardness to rape and homicide.

*Id.* at 27, 87 S.Ct. 1428.

The Court found that in light of this it would be "extraordinary" if the Constitution did not require the procedural regularity and care of due process. In short, the Court said, "Under our Constitution, the condition of being a boy does not justify a kangaroo court." *Id.* at 28–29, 87 S.Ct. 1428. Observing that if the child

---

1. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see also id.* at 479, 86 S.Ct. 1602 ("He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.").

were 18, the Constitution would guarantee *Gault*'s rights and protections relating to arrest, search, seizure and pretrial interrogation, the Court held

> We do not mean to indicate that the hearing must conform with all the requirements of a criminal trial or even the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment. We reiterate this view, here in connection with a juvenile court adjudication of 'delinquency,' as a requirement of the Due Process Clause of the Fourteenth Amendment of our Constitution.

*Id.* at 30–31, 87 S.Ct. 1428.

Specifically as to Gault's questioning, the Court confined its holding to the admissions he made in court, because that is all the trial court relied on. On the question of whether such admissions could be used against the child in the absence of clear and unequivocal evidence that the admission was made with knowledge that he was not obliged to speak and would not be penalized for remaining silent, the Court again emphasized that admissions and *confessions* of juveniles require special caution because a juvenile cannot be judged by the more exacting standards of mature adults.

And, as to self-incrimination, the Court observed that the roots of the privilege are deep, expressing the essential dividing line between the individual and the state, and prohibiting the state from depriving an individual of the decision whether to assist the state in securing his conviction. Saying that "[i]t would indeed be surprising if the privilege against self-incrimination were available to hardened criminals but not to children," *id.* at 47, 87 S.Ct. 1428, the Court found that it would be "entirely unrealistic to carve out of the Fifth Amendment all statements by juveniles on the ground that these cannot lead to 'crim-inal' involvement," *id.* at 49, 87 S.Ct. 1428, because public offense charges can lead to incarceration against one's will, a deprivation of liberty, regardless of what it is called or where the child is housed. The Court noted:

> And our Constitution guarantees that no person shall be 'compelled' to be a witness against himself when he is threatened with deprivation of his liberty—a command which this Court has broadly applied and generously implemented in accordance with the teaching of the history of the privilege and its great office in mankind's battle for freedom.

*Id.* at 50, 87 S.Ct. 1428. The Court's final holding on the privilege against self-incrimination is simple and clear: "We conclude that the constitutional privilege against self-incrimination is applicable in the case of juveniles *as it is with respect to adults.*" *Id.* at 55, 87 S.Ct. 1428 (emphasis added).

There is nothing equivocal about this statement. And while *Gault* did not deal with out-of-court confessions, it cannot be reasonably argued from the clear mandate of the Court that such statements, obtained through a police interrogation, can be treated any differently than those of adults. It is not surprising, then, that federal cases dealing with the question of whether a juvenile is entitled to *Miranda* warnings have moved past the threshold question in *Gault* to cases involving the analysis applied to confessions of adults, such as whether the person questioned was actually in custody at the time of questioning and whether the statements were voluntary.

It has been argued that the case *of Allen v. Illinois,* 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986), weakens the holdings in *Gault* because it holds that the labels "civil" and "criminal" are not dispositive, but rather it is the substance of a

procedure that determines when certain constitutional rights are required. In *Allen*, the Fifth Amendment right against self-incrimination was held inapplicable to the civil commitment procedure used to institutionalize a "sexually dangerous person" because the person committed was not being punished by the state. The state had two goals only: treatment of the person and protection of the public and him. He could leave the institution at any time his condition improved, and once committed as a sexually dangerous person, he was no longer subject to criminal penalties for his actions.

Though calling the language in *Gault* "sweeping" and "not good law", that said the Constitution guarantees that no person shall be compelled to be a witness against himself when faced with deprivation of his liberty, *id.* at 372, 106 S.Ct. 2988, the Court was careful to *distinguish Gault*, by setting forth the case for the commitment process used for sexually dangerous persons. It did not overrule any part of *Gault* that applies to the custodial interrogation of juveniles.

The latest Supreme Court case to apply *Miranda* to juveniles is *J.D.B. v. North Carolina*, —— U.S. ——, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). Indeed, the Court did not even question whether *Miranda* applied, but looked directly at the question of whether the juvenile was in custody, thereby *requiring* law enforcement to give the warnings. *See id.* at 2401. J.D.B. was a 13–year–old student who was removed from his classroom by a uniformed police officer, escorted to a closed-door conference room, and questioned by the officer for at least half an hour. A digital camera which had been stolen from a neighborhood home had been seen in J.D.B.'s possession. The juvenile investigator from the local police force went to the school and met with the school resource officer (a

police officer), the assistant principal and an administrative intern about why he was there to question J.D.B. None of them contacted J.D.B.'s custodian, his grandmother.

The school resource officer interrupted J.D.B.'s afternoon class, removed him from the room, and escorted him to the school conference room where the others were waiting. The door was closed, and he was questioned with the two police officers (one in uniform), and two administrators present, for 30 to 45 minutes. He was not given the *Miranda* warnings or an opportunity to speak with his grandmother, and was not told he was free to leave the room. Initially there was only small talk about sports and family life, and then J.D.B. was asked about what he had done the prior weekend which was when the camera was stolen. He denied any wrong-doing, and said he was in the neighborhood looking for lawns to mow.

The investigator pressed for more information and told J.D.B. one of the victims had seen him behind her house, and accused J.D.B. of stealing the camera. The assistant principal then urged J.D.B. to do the right thing, warning that the truth always comes out in the end. J.D.B. asked if he would still be in trouble if he returned the stuff, and the investigator then told him it was going to court but that J.D.B. could help himself by making it right. The investigator threatened to secure a custody order—"where you get sent to juvenile detention before the court." *Id.* at 2400. J.D.B. then admitted his involvement. It was only at that point that he was told that he could refuse to answer questions and was free to leave.

J.D.B. then wrote a statement and was allowed to catch the bus home that day. Two juvenile petitions were filed against J.D.B. He filed a motion to suppress his statements claiming that he had been in-

terrogated in a custodial setting without benefit of the *Miranda* warnings. The case worked its way through the North Carolina court system, and the United States Supreme Court granted certiorari. Taking for granted that *Miranda* applied if the child were in custody, the Court specifically held that a child's age is a factor that must be considered in doing the *Miranda* custody analysis, and essentially approved an "all relevant circumstances" test that is broader than a totality of the circumstances test. *Id.* at 2408.

In examining whether J.D.B. was in custody, the majority addressed the dissent's assertion that the question should simply turn on whether admissibility of a statement obtained through interrogation should be determined on the due process voluntariness test alone.

Saying that the *Miranda* safeguards were put in place because the voluntariness test alone could not adequately guard against the inherent pressures of a custodial interrogation, *id.,* and setting forth at length many ways that children respond differently from mature adults, the majority concluded that only the full scope of the *Miranda* protections ensures due process to children. The Court noted the particular susceptibility of juveniles to the influence of authority figures and the naturally constraining effect of being in the controlled setting of a school with its attendant rules. *Id.* at 2405.

Justice Sotomayor observed that the custody question must be answered by an objective inquiry: what were the circumstances surrounding the interrogation, and given those circumstances, would a reasonable person believe he could terminate the interrogation and leave? And, in the case of children, the Court found that there were broader considerations, such as the juvenile's age, which could carry increased weight when determining if a child is in

custody. The Court remanded the case to the state courts to fully consider all the relevant circumstances of the situation, a standard that the Court said was more inclusive than the totality of the circumstances test applied to adults.

Kentucky's Unified Juvenile Code (UJC) tracks these due process considerations. There are two chapters devoted to accountability of the child rather than to the accountability of the state to families and children. KRS Chapter 635, Public Offenders, is mandated to promote the best interests of the child through providing treatment *and sanctions* for violation of a criminal statute. KRS Chapter 640, Youthful Offenders, is aimed specifically at promoting public safety and holding every child *accountable* for his or her conduct which violates criminal statutes. Chapter 635, the Public Offender chapter, places greater emphasis on character building in the reformation of the child into a productive citizen than does Chapter 640, but also allows for and requires incarceration of a child. Chapter 640, Youthful Offender actually uses the term "delinquent youth." This chapter carries significant punitive measures because it allows a child who qualifies as a Youthful Offender to be treated and sentenced as an adult, with an adult record, under adult penalties, albeit incarceration is in a juvenile detention facility, until the child reaches age 18.

KRS 600.010(2)(g) addresses due process interests for children and related adults, and articulates that the "rights and interests of all parties ... are recognized" through appropriate *judicial procedures* that ensure "prompt and fair" hearings. *Gault* noted that there are due process requirements against self-incrimination when accountability of the child can result in incarceration, and the UJC recognizes that children can and do commit criminal acts. But it also recognizes that children

have procedural rights that may not be waived by another party.

Our statutes speak to the process designed for juvenile court. If a formal proceeding is required, the trial court is charged with explaining to the child and related adults that the child is entitled to appointed counsel, and must explain *the right against self-incrimination* by ensuring that the child knows he has the right to remain silent, and that anything said may be used against him. KRS 610.060(1)(a),(b).

**C. N.C. was entitled to *Miranda* warnings before he was interrogated.**

The facts of this case demonstrate that Appellant was in custody under the "all relevant factors" test set forth in *J.D.B.* He was taken from his classroom by a law enforcement officer, who was clearly identified as such, and who wore a gun. He was seated in the assistant principal's office, and the door was shut. The law enforcement officer sat down right beside him, across from the assistant principal. The assistant principal testified that he *expected* Appellant to stay put, which was no doubt conveyed by his demeanor.

Neither the officer nor the assistant principal told N.C. that he was free to leave. His mother was not contacted and told of the charges until after the questioning and confession. His first responses indicated that he believed that he was subject to school discipline. He was initially questioned by the assistant principal instead of the officer, thereby leading him to believe this was only a school discipline matter. The record does not indicate a lack of respect toward the school official indicative of a belief that he did not have to be there and talk.

This was on its face a school discipline proceeding. The student had no reason to believe that he was facing criminal charges. The medicine he brought to school was his legal prescription, and he was apparently aware that this violated *school* rules. There is no indication he sold or tried to sell the pills he gave the other student, and though it was legally sufficient to constitute possession and distribution charges by giving the pills to the other student, there is nothing to indicate that he knew this. In fact, the assistant principal addressed only expulsion proceedings. It was not until the questioning was over and the confession made that the law enforcement officer told N.C. that he was placing felony criminal charges against him.

The assistant principal admitted that this was a process that he and the officer had done in tandem several times before.

It is clear that N.C. was not informed that he did not have to admit to anything, or even say anything. He was not told in a timely manner that he faced criminal charges. He was not told that any statement he made would be used against him in proceeding with the criminal charges.

No reasonable student, even the vast majority of seventeen year olds, would have believed that he was at liberty to remain silent, or to leave, or that he was even admitting to criminal responsibility under these circumstances. *Stansbury,* 511 U.S. at 325, 114 S.Ct. 1526.

Yet it was, in fact, N.C.'s admissions that were the sole basis of any finding of *criminal* action by N.C. All relevant factors indicate that N.C. was in custody, he was interrogated without being informed of his rights, and he confessed without full knowledge of the consequences for so doing.

If he had been an adult under these same circumstances, there is no question that the statements would not have been admissible under *Miranda*. It also is ap-

parent that the above-noted procedural requirements in place in the UJC would require the equivalent of *Miranda* warnings before *the court* could take testimony from a child. The clear intent of the statutory proceedings is to ensure that a child is not led to unknowingly incriminate himself. It makes no sense that the safeguards required of the court should not apply to the *evidence* offered against the child. Such an end run would defeat all precepts of due process.

Finally, the Commonwealth's argument that N.C. cannot reach the custodial interrogation question because he did not specifically raise the question of whether the principal was a state actor, or in other words, acting as law enforcement, in his motion for discretionary review is not well taken. Because the assistant principal was acting in concert with the SRO, and they had established a process for cases involving interrogations of this kind, this conduct and the SRO's presence make this state action by law enforcement for *Miranda* purposes under *Mathis, Buster,* and *Hartsfield,* even if the confession came in response to questions from the assistant principal rather than the SRO.

But does it make a difference that there was also a legitimate school discipline issue involved?

### D. Balancing public needs with the child's individual rights.

There can be no question that the task of safeguarding children in our schools and maintaining appropriate discipline is an issue of paramount public importance. Education is mandatory, and we entrust our children to the school system, believing that they will be in an environment that is clean, safe and conducive to learning. Every parent, indeed, all of society, expects this. That the easy availability of drugs and more permissive behavior of our youth does not make this easy is also a given.

No one would argue that the school environment is not complex and demanding on school officials and law enforcement involved with the schools.

Under the facts of this case, it is apparent that the assistant principal and SRO carried out a necessary function. A prescription pill bottle for a highly addictive narcotic was found in the boys' bathroom, and it was empty. School rules required that all prescription medication be taken to the school nurse for safekeeping and proper administration throughout the day. Given the location of the bottle, that rule had clearly been violated. There was also talk that N.C. had given some pills to another student. That alone made it imperative for the officials to investigate.

It was also necessary to question the student whose name was on the pill bottle. But when that student was questioned with more than school discipline in mind, there was a confluence of the student's rights and the needs of the school. This is more than mere school discipline situations which do not involve criminal activity.

Many schools today have "zero tolerance" for drug-related activity, as the assistant principal indicated was the case here. When viewed in light of protecting innocent children, this certainly has merit. But the use of zero-tolerance policies has caused a dramatic shift away from traditional in-school discipline towards greater reliance on juvenile justice interventions, not just in drug cases, but also in common school misbehavior that ends up in the juvenile justice system. This comes at a significant cost to state agencies and takes the student out of the normal education process, in addition to putting these students in contact with students who committed violent offenses, gang members, or other bad influences. *See* Marc Levin, Texas Public Policy Foundation, *Schooling*

*a New Class of Criminals? Better Disciplinary Alternatives for Texas Students,* Policy Perspective 7 (March 2006), *http://www.texaspolicy.com/center/effective-justice/reports/schooling-new-class-criminals.* It is also arguably a failure of the goals of a statewide educational system.

Such policies, which emphasize criminal charges, can serve to change the nature of questioning a student for purposes of school discipline into a criminal interrogation. And while a juvenile, unless he or she is a Youthful Offender, is not *convicted* of a crime with an attendant criminal record, he or she is nonetheless given criminal sanctions or incarceration, intended to punish as much or more than to remedy. When those sanctions or incarceration are a likely result, then instead of being called a criminal, the juvenile is called delinquent. But this is a distinction without a significant difference when it comes to a student's risk of incarceration and his right not to be led into incriminating himself.

This case presents the Court with the opportunity to balance the important public policy concerns of educators and parents to provide an appropriate and safe school environment while still protecting the individual rights of a child when the child is embroiled in the juvenile justice system. The legal issue in this case—can the child's answers to questions from a school official, in the presence and in cooperation with law enforcement, be used against him in making charges and proving that he committed a criminal offense?—shows the overlapping nature of the problem. .

A balance can be obtained by recognizing the different purposes of questioning a student. To the extent that school safety is involved, school officials must be able to question students to avoid potential harm to that student and other students and school personnel. But when that questioning is done in the presence of law enforcement, for the additional purpose of obtaining evidence against the student to use in placing a criminal charge, the student's personal rights must be recognized. Both purposes were at play in this case.

It is not reasonable to expect a school principal or teacher to understand all the ramifications of obtaining a confession from a child, nor is it necessary. For the purposes of school discipline and protecting school safety, such questions are imminently sensible, and serve the public good. No such mandatory duty is placed on our educators.

But trained law enforcement is another matter. The only viable reason to have law enforcement in the schools is to be able to assert peacekeeping and custodial authority over anyone who behaves in such a way that disorder ensues or a law is broken. A law enforcement officer is trained to know when conduct violates the law versus merely being annoying. A law enforcement officer knows how conduct should be charged, and how to process a criminal charge. In this case, the law enforcement officer was *armed.* And, the assistant principal was working in concert with him.

The presence of law enforcement in schools on a daily basis serves notice that crimes will be charged for conduct the officer believes violates the law. This is not inappropriate, but it does change the nature of questioning a child for school discipline purposes to an improper police interrogation absent constitutional safeguards.

Administering school discipline does not require the participation of law-enforcement. Administering the law does.

■ Consequently, a proper balance is struck if school officials may question freely for school discipline and safety purposes, but any statement obtained may not be used against a student as a basis for a criminal charge when law enforcement is involved or if the principal is working in concert with law enforcement in obtaining incriminating statements, unless the student is given the *Miranda* warnings and makes a knowing, voluntary statement after the warnings have been given.

Every custodial interrogation, when law enforcement is involved will not necessarily invoke the giving of *Miranda* warnings, for example, if the matter purely concerns school discipline. There are many school disciplinary matters where the presence of the law enforcement "officer will maintain order and create a safer environment for the administrator and the student." However, statements obtained without giving *Miranda* warnings are subject to suppression if a criminal charge is brought.

Certainly, all trained law enforcement officers know how to give *Miranda* warnings and to ensure that the school official and the child are aware when criminal charges may be triggered. This is not an undue burden when measured against the consequences the child faces in the juvenile justice system or the adult criminal system, which clearly can be punitive. And, this protection does not prevent a school official from filing a criminal complaint, though the voluntariness of any confession remains a question of law for the court in every case, even if *Miranda* warnings have been given.

Applied to this case, the statements N.C. made before law enforcement when he was questioned by the assistant principal cannot be used to prove the truth of the charge against him before the district court, and must be suppressed because he was in custody and was not given the *Miranda* warnings.

## III. Conclusion

For the foregoing reasons, the decision of the Nelson Circuit Court, which affirmed the district court, is reversed, and this matter is remanded for further proceedings consistent with this opinion.

MINTON, C.J.; ABRAMSON and KELLER, JJ., concur. ABRAMSON, J., also concurs by separate opinion in which MINTON, C.J., joins. CUNNINGHAM, J., dissents by separate opinion in which VENTERS, J., joins. VENTERS, J., dissents by separate opinion in which CUNNINGHAM and SCOTT, JJ., join.

ABRAMSON, J., Concurring:

The dissenting opinions raise some valid points regarding the unique nature of the school setting and the rehabilitative focus of Kentucky's juvenile justice system, but I believe the majority opinion embodies the better approach to this thorny issue. Often when serious school-based events are evolving, it will be unclear whether the matter will proceed in the juvenile division of district court or in the circuit court. Consistent with the *Miranda* Court's objective that rules in this area be clear, the majority opinion establishes a bright-line rule that gives juveniles the same protections we afford adults if they respond to a custodial interrogation without the benefit of *Miranda* warnings. Moreover, this case illustrates that even seemingly less serious matters that proceed in the juvenile division of district court will not always lead to the individual receiving the rehabilitative benefits of our juvenile system. Young people, like N.C., who "age out" of the juvenile system may well end up serving time in jail with adults. While those individuals have an adjudication rather than a conviction, they still experi-

ence adult-defendant consequences. Unless and until the General Assembly provides a rehabilitative alternative for those individuals who were juveniles at the time of the offense but who can no longer participate in the juvenile system, it is inappropriate in my view to deprive them of the protections afforded adults through *Miranda* warnings and application of the suitable exclusionary rule.

As a final note, I would also observe and emphasize that the public safety exception which allows the admission of certain statements made prior to any *Miranda* warnings was recognized in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). *See also Henry v. Commonwealth,* 275 S.W.3d 194 (Ky.2008) (adult defendant's pre-warning statements admissible where defendant was believed to have abandoned a gun in an area accessible to the public; admissibility limited to responses to questions designed to locate and remove gun); *Smith v. Commonwealth,* 312 S.W.3d 353 (Ky.2010) (adult defendant's statement not admissible under public safety exception because there was no quantifiable safety threat, simply a vague belief that a gun might be present in the defendant's apartment). This safety exception has been used in the school context where there was credible evidence of a gun on school grounds. *See Commonwealth v. Dillon D.,* 448 Mass. 793, 863 N.E.2d 1287 (2007) (holding that the public-safety exception applied where a thirteen-year-old middle school student was found in possession of bullets and, before having been properly *Mirandized,* was questioned about a gun).

MINTON, C.J., joins.

CUNNINGHAM, J., Dissenting:

I respectfully dissent. It is my position that the questioning by a school principal in his office of a student suspected of wrongdoing committed on school grounds does not constitute a police interrogation as anticipated by *Miranda.* The presence of a school resource officer, who by law must be a certified law enforcement officer, does not make it a custodial interrogation anymore than the presence of a priest would have made it a church service.

It seems to me that the majority strays from the constitutional path from the outset. The opinion correctly quotes *Miranda* in defining interrogation. "The Court then clarified that 'custodial interrogation ... mean(s) questioning *initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" (Emphasis added). *Miranda* warnings were not required in this case because (1) the questioning was not initiated by the law enforcement officer; and (2) the juvenile was not in the type of custody anticipated by *Miranda.* The record is clear that the interview in this case was not initiated by law enforcement officers, but the principal of the school. With all due respect, I suggest that extensive discussion by the majority of whether N.C. was in custody is superfluous and leaps over this first basic requirement. A student in a public school is always in "custody." The student is not "free" to leave at any time after he or she arrives at school—in math class, in the hallway or cafeteria. The nature of the setting is a continuous "custody." Under the compulsory attendance laws of this state for the education of our young, the whole primary and secondary educational experience is a "custody" arrangement. KRS 159.010. In legal terms, we call it *in loco parentis.* But simply being confined and not at liberty to leave does not automatically transform into the type of "custody" envisioned by the justices of the U.S. Supreme Court when they crafted the *Miranda* decision.

The School Resource Officer (SRO), who is required to be a law enforcement officer, works for the principal. The principal is not an agent of law enforcement.

A brief history of the arrival of the SRO on the high school scene is necessary to place his role in this case in proper constitutional context.

KRS 158.440 mandated the following for our schools:

(1) Every student should have access to a safe, secure, and orderly school that is conducive to learning;

(2) All schools and school districts must have plans, policies, and procedures dealing with measures for assisting students who are at risk of academic failure or of engaging in disruptive and disorderly behavior.

To follow statutory directives, our school boards have sought professional assistance by the employment of school resource officers. These people have been invited into our schools to assist the administrators in maintaining law and order in an environment which has increasingly been infested with disruptive and even violent behavior.

KRS 158.441(2) defines the SRO as "a sworn law enforcement officer who has specialized training to work with youth at a school site." The statute also provides that "[t]he school resource officer shall be employed through a contract between a local law enforcement agency and a school district." Present training through the Department of Criminal Justice consists of School Resource Officer Basic (40 hours) and School Resource Officer Advanced (40 hours). Additionally, the Kentucky Center for School Safety provides supplemental training each year.

There are three kinds of SROs in Kentucky schools. First are those assigned by their employing agency to a school through a memorandum of understanding or other instrument between the law enforcement agency (sheriffs department or municipal department) and the school district.[2]

The funding of the officer is almost always shared between the agency and the school. Federal grant money often flows into the funding.

The second kind of an SRO is one employed directly by a school district and assigned to schools (Special Law Enforcement Officers–SLEOs). These officers' sworn authority comes from KRS 61.900–930 and is commissioned by the Secretary of the Justice and Public Safety. These officers are certified peace officers, just as with the preceding category, and meet all pre-employment and training requirements of other certified peace officers. The distinction between this category and the preceding is the employer. In this case, the school district employs the officer directly and completely.

The third category of an SRO encompasses those law enforcement officers who

2. While it appears that any School Resource Officer Agreement which might pertain to this case is not of record, the typical agreement authorized by the Kentucky Department of Education is instructive. It reflects a unique partnership between law enforcement and school authorities. It requires that the SRO have "specialized training to work with youth at a school site." The duties of the SRO are numerous, including the requirement that the officer "attend meetings of parent/faculty and school functions on request of a principal." Under this agreement, the SRO may be called upon to "assist in the delivery of instructions in varied subject areas." The agreement between the district and the law enforcement agency usually outlines coverage of expenses, days and hours present at the school(s), and other equipment and engagement provisions. Various elements of the standard agreement are the subject of further discussion in this opinion. Kentucky Center for School Safety; http://www.kycss.org.

are employed by a law enforcement agency and simply assigned to the school on a rotating basis. There is no distinction between these officers and the others as far as duties and qualifications.

What is important to point out as to the case before us is that all SROs are law enforcement officers. And they have special training in the area of dealing with school and student misbehavior, including criminal conduct. Their duties cover a multitude of education related chores. These include monitoring the parking lot, monitoring the lunchroom, clearing the hallways, counseling students, consulting with administrators, transporting students, assisting teachers, and even teaching classes. Many act as sponsors for student organizations. SCHOOL RESOURCE OFFICERS IN KENTUCKY: WHO ARE THEY AND WHAT DO THEY DO? SURVEY BY KENTUCKY CENTER FOR SCHOOL SAFETY BY DAVID C. MAY, PHD RESEARCH FELLOW AND YANFEN CHEN, MS DATA COORDINATOR, APRIL 2009.

The SRO has become as much of the educational environment in our secondary schools as lunchroom dieticians, guidance counselors, and athletic directors.

While the SRO is technically assigned to the school by the law enforcement agency, in reality the local school system picks the officer. The standard agreement provides for an interview committee consisting of the school superintendent, a member of the Board of Education, a couple of school principals from the system, and the head of the participating law enforcement agency. Only those approved by the majority vote of the interview committee can be assigned to a school as a SRO.

So, in effect, the school system selects the officer to be the SRO. Also, the school is required to give logistical support for the SRO, including an office, filing cabinet, phone, and the like. And interestingly, the SRO must be a volunteer. In other words, a law enforcement agency cannot compel any of its members to serve as an SRO. The school system demands a "cheerful giver."

Why does all this matter?

It explains how the SROs, who are duly certified peace officers, have blended into our educational system as to become part of the culture. They are not going away. They will always be an integral arm of the principals and chief disciplinarians of our schools. But they are not "cops" in the conventional sense. Their presence and even assistance in student interviews are not equivalent to the intimidation of normal police interrogations. Their roles are education driven. The title itself—"resource" officer—is telling. The description by the majority that this is a case of "a school official working with the police" is not completely accurate. It is a school official working with another school official who is required by law to be a law enforcement officer.

The world has turned around many times in the 46 years since *Miranda* was decided. Surely, that Supreme Court did not anticipate that fully trained and even armed law enforcement officers roaming the halls of our public schools would become the norm. Sadly, it has not only become the norm, but a necessity. It is a part of our educational quilt work of varying social and cultural duties thrown upon the teachers of our young. Surely, the U.S. Supreme Court of 1966 could not have envisioned the questioning of a student by a principal in a high school with a SRO present as being a "custodial interrogation" requiring constitutional attention.

I believe that supposition is supported by the post *Miranda* decisions. Our nation's highest Court has spent the decades since *Miranda* not expanding the definition of "custody," but restricting it. *See*

*Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (finding that *Miranda* warnings need not be given when questioning a person incident to the booking process at the police station); *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (holding that *Miranda* warnings are not required where an undercover officer is acting as a prisoner for the purpose of acquiring information from other incarcerated inmates); *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (stating that a roadside traffic stop is not custody within the context of *Miranda* ); *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). (acknowledging that there is a " 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence."); *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (finding that a person on probation is not in custody for *Miranda* purposes when he is questioned by a probation officer, even though the appearance is mandatory); *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (stating the defendant was not entitled to *Miranda* warnings when he voluntarily came to the police station and was free to leave at any time); *Beckwith v. U.S.*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (finding that an Internal Revenue Service agent did not need to give a private citizen his *Miranda* warnings even though the suspect was under criminal investigation and stated that he felt subject to psychological restraints); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (holding that a statement obtained in violation of *Miranda* was still admissible against the defendant for the purposes of impeachment); *Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (stating that it was not error to use a tape recorded conversation between defendant and his wife after defendant invoked his *Miranda* rights).

We swim against this constitutional current today by expanding it to include questioning by school administrators at the expense of school discipline and order. And our Kentucky Supreme Court does so today without citing or following one single case of any of the 50 other jurisdictions—state and federal—that has so held under the facts of this case.

I'm taken back by the statement in the majority opinion that "administering school discipline does not require the participation of law enforcement." Sometimes it does not, but with ever increasing frequency it does. This faulty assumption is rooted in the nostalgia of a much more innocent time when school discipline was all about classroom disruption, throwing paper wads and erasers, bathroom graffiti, and playing hooky. That unrealistic statement is surely not meant for trafficking in hydrocodone as we have here. Or loaded guns and box cutters. I learn from our juvenile drug court people that we have 10–year–old students in this state already experimenting with cocaine and other hard drugs.

One of the cases cited at length by the majority is glaringly distinguishable from the facts before us. In *J.D.B. v. North Carolina*, —— U.S. ——, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011), a police officer investigating a burglary came to the school to interview J.D.B. The thirteen-year-old was the prime suspect in the burglary and had even been questioned previously. Law enforcement, accompanied by school administrators, removed the juvenile from his classroom and took him to a conference room and interrogated him. It was a crime committed off the school property being investigated by the police who came to the school, initiated, and conducted the

interrogation. Those facts are totally different from the ones now before us.

We cannot deny that there are situations where—as in *J.D.B.*—the interrogation of juveniles required the *Miranda* admonition, even when it is on school property. When the investigation is initiated and carried out primarily by the police for crimes committed off school property, it becomes a law enforcement action even when it is conducted in a conference room on school property. In this case, a teacher found the pill bottle and turned it over to the principal who conducted the investigation and questioning only with the assistance of the SRO. It was a spontaneous response, demanding immediate attention and quick resolution with the school administrator fully in charge. It was not a law enforcement endeavor, and the presence or even assistance of the SRO does not make it so.

Most assuredly there is a line which can be crossed. It was crossed in *J.D.B.* It was not crossed in this case.

What concerns me most in this case is not the cumbersome requirement of *Miranda* warnings invading the duties of the school principals charged with the responsibility of maintaining order and discipline in our places of learning. They will survive this imposition just as they have survived the scores of other regulations placed upon them in recent years. What concerns me most is the danger it bodes for the safety of our children.

When *Miranda* rights are required to be given, we must assume that those rights will be invoked. If the *Miranda* warnings had been given here in this school setting and had N.C. asserted his right to remain silent, then the two pills of hydrocodone would not have been recovered. Students would have been endangered.

The majority, in its final pages, attempts to minimize the far ranging ramifications of this opinion. Our majority opinion limits the exclusionary rule only to those school disciplinary investigations where outside criminal charges are anticipated and there is the presence of a SRO. I would respectfully submit that that is the most dangerous time when a school administrator should not be impeded in his or her truth-seeking duties by the imposition of constitutional restraints. For it is in those critical situations that the safety of our school children is most imperiled.

Knowing the deep concern and affection my brothers and sisters on this Court have for children, I'm moved to suspect that the full ramifications of this decision are not amply recognized.

First of all, I fear that school principals and assistant principals will—to avoid the dictates of this opinion—be inclined to diminish the needful role of SROs in their disciplinary investigations. This will not only make their inquiries less effective, but may also pose a risk to their own personal safety.

In a known emergency, the principal might be able to avoid the *Miranda* mandate. I'm not as concerned for the information obtained without *Miranda* warnings as the information *not* received because of the *Miranda* warnings. This concern is much more ominous.

Suppose there is a fight in the cafeteria. Two young men—both repeat offenders with histories of violence and likely headed to outside court—are brought to the office. The resource officer is asked to be present for the interview by the principal. Maybe the SRO is even involved in the investigation. These factors meet all those given by the majority for the requirement of the *Miranda* warnings. In attempting to sort out the reasons for the fisticuffs, the *Miranda* warnings are given by the principal.

The con wise teenager, only weeks shy of his 18th birthday, asserts the right to remain silent and asks for a lawyer. What he might have said, had the questioning proceeded uninterrupted by the constraints we impose here today, was that he had possessed a loaded Glock in his pocket at the time of the fight. He passed it to another student before the school authorities arrived on the scene. Now, thanks to our ruling, there is a loaded weapon within the classrooms of this school, endangering the lives of hundreds of innocent boys and girls and totally unknown to the principal. In this day and age, we should not be impairing school safety by the enlargement of rights of the students. I beseechingly suggest that we should be more diligent in the protection of our precious young.

I must, therefore, respectfully dissent.

VENTERS, J., joins this dissent.

VENTERS, J., Dissents:

I agree with Justice Cunningham that the ordinary *Miranda*-analysis to determine if a statement was made while "in custody" is not required where a minor admits to a public offense in response to questioning by a school authority about a school-related issue. However, I would go further. For the reasons set forth below,

I am recommending that this Court chart a new course.[3]

## LIMITED APPLICATION OF THE EXCLUSIONARY RULE

In juvenile delinquency cases ("public offense actions"[4]) adjudicated in the juvenile division of the District Court, we should exclude probative evidence under the exclusionary rule *only* where it "serves to deter deliberate, reckless, or grossly negligent" police conduct[5] and, in the case of Fifth Amendment violations, *only* where the circumstances indicate the statement was actually involuntarily given or was produced under circumstances that cast doubt upon its reliability. In such circumstances, and in youthful offender cases transferred to circuit court for an adult-like trial, the exclusionary rule would apply in its traditional form. Otherwise, however, the exclusionary rule should not apply in a juvenile court adjudication. The rule I propose does not conflict with any provision of the Kentucky Revised Statutes, or any published opinion of a Kentucky court.[6] It does not offend any part of the Kentucky Constitution or the Constitution of the United States.

The United States Supreme Court has never explicitly determined that the exclusionary rule must be applied in typical juvenile court delinquency cases. That

---

3. Attribution for the general information used in this opinion is given to two scholarly articles: Irene Merker Rosenberg, *A Door Left Open: Applicability of the Fourth Amendment Exclusionary Rule to Juvenile Court Delinquency Hearings*, 24 Am. J.Crim. L. 29 (1996), and to a lesser extent, Bryan Stoddard, *New Jersey v. T.L.O.: School Searches and the Applicability of the Exclusionary Rule in Juvenile Delinquency and Criminal Proceedings*, 2011 B.Y.U. Educ. & L.J. 667 (2011).

4. As used in Kentucky's Unified Juvenile Code, a "[p]ublic offense action" is "an action, excluding contempt, brought in the interest of a child who is accused of committing an offense under KRS Chapter 527 or a pub-

lic offense which, if committed by an adult, would be a crime" excluding actions alleging that a child of sixteen years or older has committed a motor vehicle offense. KRS 600.020(48).

5. *Herring v. United States*, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).

6. In *Welch v. Commonwealth*, 149 S.W.3d 407, 411–12 (Ky.2004), this Court ordered the suppression of a juvenile's confession. *Welch*, however does not conflict with the view I herein espouse because the juvenile in *Welch* was being tried as an adult, not as a public offender in juvenile court.

Court's well-established pattern of applying the exclusionary rule only when the benefit of its deterrent effect outweighs the social costs incurred when valuable evidence is ignored, has never been applied to this question. I believe that when that balancing test is applied, it quickly becomes obvious that the broad, unlimited use of the rule, exacts too high of a cost upon both the troubled youth and the community that surrounds him, and it fails to deliver upon the promise of deterring bad police behavior.

In short, the exclusionary rule is antithetical to the overarching principles for which Kentucky's juvenile court system was established. On the one hand, it is questionable whether use of the exclusionary rule actually serves its intended purpose—deterring *future* misconduct by police, which is the only rationale given to support the rule. On the other hand, it cannot be reasonably doubted that allowing a juvenile offender to elude responsibility for his misdeeds teaches the misleading lesson that sometimes you really can "get away with crime;" and that, on occasion, "crime really does pay." Applying the exclusionary rule in a juvenile court public offense action makes sense only to those who believe that children benefit from the lesson that suppressing the truth is a good thing, and that slapping a police officer's wrist is more important than providing a wayward child with the treatment and tools he needs to lead a responsible life.

As noted, I readily distinguish the typical public offense action processed to conclusion in the juvenile court from the youthful offender cases that are transferred to circuit court for trial. Obviously, these two very different processes are driven by opposing social policies—the former is driven by what *treatment* is in the child's best interest; the latter is driven by what *punishment* is adequate, in society's best interest, to vindicate the peace and dignity of the Commonwealth. That critical difference substantially alters the calculus by which we weigh the efficacy of the exclusionary rule. Given that difference, it is absurd to say that because the exclusionary rule applies in the latter case, it must also apply in the former. I would also submit that under the prevailing U.S. Supreme Court analysis, it is necessary to draw a distinction between the cases in which a juvenile's inculpatory statements, though ill-advised or uninformed, were nonetheless voluntarily made, and the cases in which circumstances, like coercive police conduct, cast reasonable doubt upon the voluntariness of a youngster's custodial confession. In exclusionary rule analysis, deterrence of improper police conduct is balanced against the cost to justice of sacrificing probative proof. It follows that when the police misconduct is more offensive, the need to secure personal liberty makes us more willing to pay the cost of excluding valuable evidence. Therefore, I would apply the exclusionary rule when the objective of the case is the prosecution of a youthful offender, and in cases where the police acted with a purposeful or a grossly neglectful disregard of constitutional liberty. In juvenile court delinquency (or "public offense") actions, where we must focus on the child's best interest and provide treatment needed to improve his condition, we cannot afford to exclude evidence from the judge's consideration simply because, as in this case, a child was not advised of his right to remain silent.

A fair consideration of this view must begin with a brief overview of the exclusionary rule's development.

## I. DEVELOPMENT OF THE EXCLUSIONARY RULE: OPINIONS OF THE UNITED STATES SUPREME COURT

The exclusionary rule is a judicially created means of deterring police misconduct

that violates Fourth and Fifth Amendment protections. *Pennsylvania Bd. of Probation and Parole v. Scott,* 524 U.S. 357, 363, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (citing *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). It is not a. personal constitutional right in itself; it was not designed to redress the injury of constitutional violations; instead, the rule operates to deter future violations by depriving the government of the fruits of such infringements. *Withrow v. Williams,* 507 U.S. 680, 686, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (quoting *Stone v. Powell,* 428 U.S. 465, 486–93, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) and *Linkletter v. Walker,* 381 U.S. 618, 637, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965)); *see also Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) ("The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.").

The exclusionary rule has been a reluctantly-applied, "last resort" [7] measure imposed in criminal cases despite its substantial costs to justice and public safety, because it is necessary in the long term to protect constitutional liberty from governmental abuse. A review of the rule's development typically begins with *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

In *Weeks,* a United States marshal in the company of local police officers, without a warrant, "invade[d] the house and privacy of the accused" while he was away and seized his documents. The United States Supreme Court held that the purloined papers should have been returned to the accused, and could not be used as evidence in a federal criminal trial. *Id.* at

398, 34 S.Ct. 341. The Supreme Court noted that the Fourth Amendment's "limitations" restrained only the conduct of federal officials, not state officials. *Id.* In *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the Supreme Court applied the exclusionary rule to Fourth Amendment violations by state officers. Just before *Mapp,* the Court reached the same conclusion with respect to the Fifth Amendment right against involuntary self-incrimination. It held in *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) that a confession "not freely self-determined" because it was obtained by conduct of state law enforcement officials intended "to overbear a suspect's will to resist" violated the Fifth Amendment and could not be admitted in state court criminal trials.

*Rogers* set the stage for the well-known *Miranda v. Arizona* decision, in which the Supreme Court resolved that unless an individual in custody was "warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires ... no evidence obtained as a result of interrogation can be used against him." *Miranda,* 384 U.S. 436, 479, 86 S.Ct. 1602 (1966).

In subsequent cases, the Supreme Court has refused to apply the exclusionary rule in the following kinds of cases:

a. Grand Jury Proceedings—*United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974);

b. Deportation Proceedings—*INS v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984);

7. *Hudson v. Michigan,* 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006).

c. Parole Revocation Hearings—*Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998);

d. Civil Tax Proceedings—*United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976);

e. Officer's Good Faith Action—*United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *see also Herring v. United States*, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (the exclusionary rule was not applicable where police conducted a search pursuant to an arrest warrant, not knowing that the warrant had been withdrawn.).

f. Violations of the knock and announce rule—*Hudson v. Michigan*, 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006).

The determination of whether and when the exclusionary rule is applied is not random. The Supreme Court has determined that whenever it considers whether to extend the exclusionary rule beyond its traditional criminal trial origin, it will subject the competing societal interest to a balancing test.

## II. EXTENSION OF THE EX-CLUSIONARY RULE—A BALANCING TEST

Because the purpose of the rule is to act as a deterrent, "it has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons." *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Instead, its application "has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Calandra*, 414 U.S. at 348, 94 S.Ct. 613. In *Janis*, the Court said, "[i]f … the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is

unwarranted." 428 U.S at 454, 96 S.Ct. 3021. Because "the [exclusionary] rule is prudential rather than constitutionally mandated" the Court "held it to be applicable only where its deterrence benefits outweigh its 'substantial social costs.'" *Scott*, 524 U.S. at 363, 118 S.Ct. 2014 (citing *United States v. Leon*, 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).

This cost vs. benefit test for determining where the exclusionary rule applies remains the critical factor in Supreme Court analysis. For example, when the Court rejected the application of the exclusionary rule to "knock-and announce" violations by police in *Hudson v. Michigan*, 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), it said:

> Suppression of evidence, however, has always been our last resort, not our first impulse. The exclusionary rule generates "substantial social costs," which sometimes include setting the guilty free and the dangerous at large. We have therefore been "cautio[us] against expanding" it, and "have repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." *We have rejected "[i]ndiscriminate application" of the rule, and have held it to be applicable only "where its remedial objectives are thought most efficaciously served,"—that is, "where its deterrence benefits outweigh its 'substantial social costs [.]'"*

*Id.* at 591, 126 S.Ct. 2159. (citations omitted)(emphasis added).

"Proposed extensions of the exclusionary rule to proceedings other than the criminal trial itself have been evaluated and rejected under the same analytic [balancing test] approach." *Leon*, 468 U.S. at 909, 104 S.Ct. 3405. Noting again that the benefit of deterrence achieved by exclud-

ing valuable evidence must be weighed against its substantial social costs, the Court, in *Herring* reiterated that the exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." 555 U.S. at 144, 129 S.Ct. 695. The Court then added: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable *that such deterrence is worth the price paid by the justice system.*" *Id.* (emphasis added).

The United States Supreme Court has yet to consider explicitly whether the exclusionary rule should be applied to exclude the un-Mirandized statements of a juvenile suspect from a "public offense action" (or routine delinquency case). The Court has never conducted the analysis required by *Hudson, Leon, Herring, Scott, Stone, Lopez–Mendoza,* and *Calandra;* that is, it has never weighed the likely deterrent benefits of applying the rule against the societal costs of depriving juvenile court judges and caseworkers of essential evidence needed to stop the descent of a young person into a criminal lifestyle. The Court has also not evaluated the effect of the exclusionary rule upon the strong public policies expressed by state legislatures, such as the policies codified in Kentucky's Unified Juvenile Code.

The Supreme Court approached the issue of the juvenile courts' use of the exclusionary rule in *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). However, its decision in that case affirmed the juvenile court's determination that the child's rights were not violated and thereby eliminated any exclusionary rule concerns. In the case of *New Jersey v. T.L.O,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) the Supreme Court granted certiorari to address that very question of exclusionary rule applicability in the juvenile court setting. Again, the Court concluded that no constitutional rights of the child had been violated, and so it declined to address the broader issue of the exclusionary rule. Most recently, in *J.D.B. v. North Carolina,* —— U.S. ——, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011), the Court held that the age of a child questioned by police should factor into the determination of whether the child was in "custody" for purposes of providing *Miranda* warnings. The child's age mattered, the Court said, when deciding if the juvenile's "will was overborne" by the circumstances of the police interrogation. The Court's concern arose from its observation that "the pressure of custodial interrogation" can be so immense as to induce a "frighteningly high percentage of people to confess to crimes they never committed[,]" a risk all the more troubling and acute when the subject being interrogated is a juvenile. *Id.* at 2401. By remanding the case for the state courts to determine whether the child was "in custody," the Court again evaded the larger question of whether the exclusionary rule should bar the juvenile court's consideration of every un-Mirandized statement in a juvenile case.

One could, upon conjecture, speculate that the Court would not have remanded the case *if* it had thought the exclusionary rule was inapplicable in the juvenile proceeding. But, of course, if the child was not in custody the question of excluding un-Mirandized evidence is immaterial. A more plausible assessment might be that since the Court has never applied its prescribed balancing test to determine if the exclusionary rule applies in a juvenile court case, the Court has purposefully left that question unresolved. In any event, nothing in *J.D.B.* is inconsistent with the directive in *Herring, supra,* that "to trigger the exclusionary rule, police conduct

must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."

The question that remains is whether likely benefits to constitutional liberties that might be derived from deterring the un-Mirandized interview of juvenile suspects is worth the price paid first, by juvenile offenders who thereby evade the therapies of the juvenile court system, and second, by the community at large, which ultimately bears the costs of un-atoned juvenile delinquency.

## III. APPLICATION OF GAULT— RIGHTS OF JUVENILE SUSPECTS

The position asserted herein is in no part dependent upon the supposition that the juvenile has no cognizable Fourth and Fifth Amendment Rights, and Due Process Rights under the Fourteenth Amendment. Unquestionably they do. But having such constitutional protections does not equate to having the "benefits" of the exclusionary rule. If it did, the rule would extend universally to deportation hearings, parole revocations, civil actions, and wherever else one may suffer the use of ill-gotten evidence.

The landscape of juvenile court adjudication changed for the better with the Supreme Court decision in *Application of Gault*,[8] 387 U.S. 1, 17, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). *Gault* established with clarity that the Fourth Amendment protection against unreasonable search and seizure, the Fifth Amendment protec-

tion against being compelled to give evidence against oneself, and the Right to Due Process[9] are shared by all, adult and minors alike. *Id.* at 31–57, 87 S.Ct. 1428. These basic constitutional rights include the right to notice of charges, the right to counsel, the privilege against self-incrimination, and the right to confrontation. The Court in *Gault* intimated, but did not explicitly state, that evidence obtained in violation of the juvenile's rights could be excluded from the evidence used to determine his guilt. The Court based its conclusion upon the fact in *Gault* that the juvenile being "tried" was exposed to very adult-like punishment. Even though the juvenile would not be "convicted" of a crime like an adult, but would merely be labeled as "delinquent," the child in *Gault* was "subjected to the loss of his liberty *for years*[,]" a punishment the Court found to be "comparable in seriousness to a felony prosecution." *Id.* at 36, 87 S.Ct. 1428.

*Gault* was a 1967 case, and since then much has changed in juvenile adjudication, in large part because of *Gault*. Under modern juvenile justice codes, the juvenile would be subjected to the youthful offender process, as provided for in KRS Chapter 640. Under the view I assert herein, the exclusionary rule *would apply* in cases like *Gault*, what we call youthful offender prosecutions, just as it applies for any adult being prosecuted for a felony in circuit court. But a different procedure driven by a different legislative policy drives the typical juvenile court "public offender action" in Kentucky, where KRS 635.060 limits the public offender's punishment of

---

8. This case is often referred to as *"In re Gault."* Westlaw designates the style of the case as *"Application of Gault"* and I adopt that convention herein.

9. Due Process includes the right to fair notice of the charges, an opportunity to be heard, a

right to legal counsel, the right to confront witnesses, and in juvenile adjudications, the "beyond reasonable doubt standard" of proof. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

detention, regardless of the seriousness of the offense, to "an approved secure juvenile detention facility, juvenile holding facility, or approved detention program" for a period of not more than forty-five days for children between fourteen to sixteen years of age, and not more than ninety days for sixteen and seventeen year olds. The dissimilar treatment reflects the different social policy at work, and thus is tried under a different procedure that merits special consideration of what and when the court must ignore highly probative evidence. The point is, as *Gault* well-establishes, juveniles have constitutional protections akin to those of adults, and when they are confronted with adult-like criminal prosecution and adult-like punishment, the exclusionary rule applies. But when different circumstances exist, different considerations are present, and different rules apply—as in the deportation, parole revocation, and tax cases.

## IV. KENTUCKY LAW—APPLYING THE BALANCING TEST

We cannot properly apply the exclusionary rule in Kentucky juvenile court actions without having considered its effects and its social costs on the important public policy objectives embedded in Kentucky's juvenile code. This Court has previously recognized the distinct policy goals that distinguish the adult justice system from the juvenile justice system. "The Juvenile Code was enacted with the stated goal of *rehabilitating juvenile offenders,* when feasible, as opposed to the primarily punitive nature of the adult penal code." *Phelps v. Commonwealth,* 125 S.W.3d 237, 240 (Ky.2004) (emphasis added).

As discussed above, the United States Supreme Court cautions against over-extending the exclusionary rule because of its "costly toll upon truth-seeking and law enforcement objectives." *Hudson,* 547 U.S. at 591, 126 S.Ct. 2159. In juvenile court public offender actions, "truth-seeking" is not just a laudable goal, a hoped-for result; it is the statutorily-mandated, "law enforcement objective" of the juvenile court judge. KRS 610.080(1) directs that "[t]he [public offender] adjudication *shall determine the truth or falsity of the allegations in the petition* [.]" (emphasis added). In an adult prosecution or a youthful offender trial the jury determines *only* if guilt has been established beyond a reasonable doubt. The jury *never* determines if the charge is, in fact, "true or false." The purpose of the juvenile court statutes is to "promote the best interests of the child through providing treatment and sanctions to reduce recidivism and assist in making the child a productive citizen by advancing the principles of personal responsibility, accountability, and reformation, while maintaining public safety, and seeking restitution and reparation[.]" KRS 600.010(2)(e). Therefore, finding the "truth or falsity" of the accusation is absolutely critical to providing the effective and responsible treatment directed by the legislature.

When the truthfulness of the juvenile adjudication is skewed by the artificial rejection of credible and highly-probative evidence, the social policy to be implemented by the statute is thwarted. Ignoring a fact so important as a credible, but ill-advised and uninformed admission in a juvenile action also impedes that directive of KRS 600.010(2)(d) that mandates, "[a]ny child brought before the court under KRS Chapters 600 to 645 shall have a right to treatment reasonably calculated to bring about an improvement of his or her condition[.]" It can fairly be said that depriving the juvenile court of critical information about a wayward child's expression of culpability defeats the court's ability to deliver "treatment reasonably calculated to bring about an improvement" in the child's

condition. It is worth noting that our system of criminal justice for adults has no analogous public policy. Forcing Kentucky's district court judges and juvenile court caseworkers to ignore the most probative proof of a juvenile's wrong-doing, simply because he was not informed of his *Miranda*-rights, defeats that strong policy and makes it nearly impossible to provide the treatment and sanctions needed to serve the "best interests of the child."

In Kentucky, juvenile adjudications are not considered criminal matters, they are civil cases. They do not result in the permanent stigma that attaches by way of a criminal "conviction" or judgment. *See Manns v. Commonwealth,* 80 S.W.3d 439, 445 (Ky.2002) ("a juvenile adjudication is not a criminal conviction, but an adjudication of a status."). KRS 635.040 provides:

> No adjudication by a juvenile session of District Court shall be deemed a conviction, nor shall such adjudication operate to impose any of the civil disabilities ordinarily resulting from a criminal conviction, nor shall any child be found guilty or be deemed a criminal by reason of such adjudication.

What, then, is the beneficial deterrent effect to be gained by applying the exclusionary rule in juvenile court cases? It would certainly be no greater than the beneficial deterrence achieved by enforcing the exclusionary rule in adult cases. So, with a greater public policy at work in juvenile cases to favor inclusion of "tainted" but credible evidence, and no offsetting increase in the beneficial deterrent effect of exclusion, the scale tips against the use of the exclusionary rule in juvenile court cases. One scholarly article even suggests the deterrence effect would be even less effective.[10] Professor Rosenberg suggests that beneficial deterrence of the exclusionary rule may diminish in juvenile cases because police officers, recognizing the heightened importance of arresting a juvenile for criminal conduct, may proceed with a warrantless or otherwise doubtful search, in order to "protect a youngster," trusting that parents or court officials can still find a way to render appropriate corrective measures. Rosenberg also suggests that the juvenile adjudications have a lesser "cachet" for police than adult convictions. As a result they may be less concerned about upholding the validity of a juvenile adjudication, therefore less likely to be deterred by the threat of evidence suppression. The fact that children in juvenile court receive milder "punishment" than adult offenders leads some police officers to be indifferent about winning a "conviction" and consequently, less apt to be careful in perfecting their collection of evidence.

For me, the balancing test weighs heavily in opposition to applying the exclusionary rule in juvenile court cases, except as noted in the opening section of this opinion. My opinion is informed not only by my review of the applicable opinions of other courts, but also by my experience as district court judge presiding over countless juvenile court adjudications between 1979 to 1984. I am aware that much has changed since then concerning the law and the culture in which children learn the habits that will either make them trustworthy, responsible and productive adults or will make them criminals; however, I do not believe that basic human nature has changed. I realize that limiting the exclusionary rule as I propose may result in many children crying "foul" and saying "it's not fair"[11] when wrongful invasions of their privacy or their un-Mirandized statements are used by the juvenile judge to apply corrective treatment. But with maturity, they will recognize the greater les-

---

**10.** Irene Merker Rosenberg, *supra* note 1.

**11.** Irene Merker Rosenberg, *supra* note 1.

son learned was in becoming responsible for their own conduct. On the other hand, when the exclusionary rule is applied, and the child sees his own admissions of culpability, or the stolen goods found in his car, being swept under the rug as if they never existed, a different lesson is learned—the lesson that they can get away with a crime or that crime does pay off in the end. I would urge the Court to adopt the policy that teaches the former lesson, and avoids the latter lesson.

## V. CONCLUSION

In "public offender actions" adjudicated in the juvenile division of the district court, probative evidence should be excluded by the exclusionary rule *only* where it "serves to deter deliberate, reckless, or grossly negligent" police conduct [12] and, in the case of Fifth Amendment violations, only where the circumstances indicate the statement was actually involuntary given or was produced under circumstances that cast doubt upon its reliability. Of the few states that have explicitly addressed the issue as I have framed it, I have found none that limit the use of the exclusionary rule as I suggest. But the same was true of every "landmark" decision when it was made. After all, the purpose of a landmark is to show others the way.

Compelling the use of the exclusionary rule in juvenile court cases like the one at hand sacrifices important policy objectives designed to improve the condition of troubled youths for the dubious expectation that it will improve the conduct of police officers. For the reasons stated above, I dissent.

CUNNINGHAM and SCOTT, JJ., join.

12. *Herring,* 555 U.S. at 144, 129 S.Ct. 695