

**FILED**

Feb 22 2018, 8:12 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffery A. Earl
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

D. Z.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

February 22, 2018

Court of Appeals Case No.
32A05-1708-JV-1907

Appeal from the Hendricks
Superior Court

The Honorable Karen M. Love,
Judge

Trial Court Cause No.
32D03-1704-JD-86

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, D.Z., appeals the juvenile court's delinquency adjudication for an act that would have been a Class B misdemeanor if committed by an adult.

We reverse.

# ISSUE

D.Z. presents us with four issues on appeal, one of which we find dispositive and which we restate as: Whether the juvenile court abused its discretion by admitting D.Z.'s incriminating statements to a school official, who was working in cooperation with law enforcement.

# FACTS AND PROCEDURAL HISTORY

Around February or March 2017, graffiti of a sexual nature began to appear on the walls of the boys' restrooms at Brownsburg High School, in Indiana. Assistant principal Demetrius Dowler (Dowler) commenced an investigation to find the person responsible and reviewed surveillance video footage of the hallways where the related bathrooms are located. On March 15, 2017, Dowler reported "mischief of vandalism and graffiti" on the bathroom walls and stalls to Officer Nathan Flynn (Officer Flynn) and requested his assistance with the ongoing investigation. (Tr. p. 17). Officer Flynn is a police officer with the Brownsburg community schools and is employed "by the school for law enforcement duties." (Tr. p. 17). In that capacity, he is "called to investigate allegations of misconduct within the school." (Tr. p. 17). Together, Officer

Flynn and Dowler started a methodical search of the boys' restrooms and narrowed down time frames when graffiti was located. They used these time frames to review surveillance footage to determine who was in the restrooms during the time when new graffiti appeared. After reviewing the surveillance video, both Officer Flynn and Dowler pinpointed seventeen-year-old D.Z. as a suspect.

[5] On March 17, 2017, Dowler called D.Z. down to his office for a "discussion" right before the "[e]nd of the day." (Tr. pp. 55, 56). Dowler questioned D.Z. in his office with the door closed. D.Z. was not offered the opportunity to speak to a parent or guardian prior to the commencement of the interview, nor was his parent or guardian contacted prior to D.Z.'s removal from class. During this conversation, D.Z. was not advised that "he had a right not to answer questions that might incriminate himself." (Tr. p. 56). Dowler informed D.Z. that he had been "tracking some restroom graffiti" and explained the investigation to him. (Tr. p. 61). Dowler clarified that he "knew that [D.Z.] was the one that was responsible for graffiti on the wall." (Tr. p. 61). D.Z. responded that he didn't know why he did it. After D.Z. showed remorse, Dowler told him that "what [he] did was wrong and so we're going to have to definitely take care of it." (Tr. p. 62). Dowler suspended D.Z. for five days. After his discussion with D.Z., Dowler left the room and informed Officer Flynn that D.Z. had "admitted to the messages/writing on the wall." (Tr. p. 43). Dowler then contacted D.Z.'s father. Meanwhile, Officer Flynn, in full police uniform, entered Dowler's office and spoke to D.Z. The officer did not

advise D.Z. of his constitutional rights, contact D.Z.'s father, or record the interview. Eventually, at the end of the interview, Officer Flynn "let [D.Z.] know he was being charged with a crime." (Tr. p. 44).

[6] On April 18, 2017, the State filed a Petition Alleging Delinquency, claiming that D.Z. had committed acts that would be an offense if committed by an adult, namely, criminal mischief and harassment. On July 17, 2017, the juvenile court conducted a fact-finding hearing. During the hearing, D.Z. moved to suppress, and the State agreed to suppress, the testimony of Officer Flynn regarding incriminating statements made to him by D.Z. as D.Z. had not been informed of his *Miranda*[1] rights prior to uttering the statements. The juvenile court granted the motion. At the conclusion of the fact-finding hearing, the juvenile court entered a true finding on the allegation of criminal mischief, as a Class B misdemeanor if committed by an adult, but found that the State had not established the harassment allegation beyond a reasonable doubt. That same day, the juvenile court placed D.Z. on probation for four months.

[7] D.Z. now appeals. Additional facts will be provided when necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[8] D.Z. contends that the juvenile court abused its discretion by admitting into evidence, over his objection, the incriminating statements he made during the meeting with the assistant principal. He maintains that these statements were obtained in violation of the Fifth Amendment to the United States Constitution because he was subjected to a custodial interrogation without being advised of his rights under *Miranda*.

[9] A trial court is afforded broad discretion in ruling on the admissibility of evidence, and we will reverse such a ruling only upon a showing of an abuse of discretion. *Bentley v. State*, 846 N.E.2d 300, 304 (Ind. Ct. App. 2006), *trans. denied*. An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id*. In making this decision, this court does not reweigh evidence and considers conflicting evidence in a light most favorable to the trial court's ruling. *Cole v. State*, 878 N.E.2d 882, 885 (Ind. Ct. App. 2007). Regarding the "abuse of discretion" standard generally, our supreme court has observed, "to the extent a ruling is based on an error of law or is not supported by the evidence it is reversible, and the trial court has no discretion to reach the wrong result." *Pruitt v. State*, 834 N.E.2d 90, 104 (Ind. 2005).

[10] "A juvenile charged with delinquency is entitled to have the court apply those common law jurisprudential principles [that] experience and reason have shown are necessary to give the accused the essence of a fair trial." *In re K.G.*, 808 N.E. 2d 631, 635 (Ind. 2004) (citing *In re Gault*, 387 U.S. 1, 30, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)). "Without question, these include . . . the

constitutional privilege against self-incrimination[.]" *Id*. "In protection of the rights against self-incrimination, the United States Supreme Court's opinion in *Miranda v. Arizona*, established that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *P.M. v. State*, 861 N.E.2d 710, 713 (Ind. Ct. App. 2007). Such procedural safeguards include an advisement to the accused that he has the right to remain silent and that anything he says can be used against him." *Id*.

[11] We have previously reiterated that "[t]he special status accorded juveniles in other areas of the law is fully applicable in the area of criminal procedure." *S.D. v. State*, 937 N.E.2d 425, 429 (Ind. Ct. App. 2010), *trans. denied*. "To give effect to that status in the context of waiving intricate, important, and long established Fifth . . . Amendment rights, we require that a juvenile be afforded a meaningful opportunity to consult with a parent or guardian before solicitation of any statement." *Id*. That is, in cases where a juvenile is subject to custodial interrogation, such child must be read his rights under *Miranda* and the State must obtain the waiver of such rights pursuant to the juvenile waiver statute. *See* I.C. § 31-32-5-1. As a general rule, however, *Miranda* warnings and the juvenile waiver statute attach only where a subject is both in custody and subject to interrogation. *See S.D.*, 937 N.E.2d at 430. Therefore, the threshold question becomes whether D.Z. was in custody, and if so, whether the

questioning by the assistant principal constituted interrogation as recognized under the federal and state constitutions.

### III. *Custodial Interrogation in the Schoolhouse*

D.Z. contends he was subjected to a custodial interrogation because no reasonable juvenile who is called into the assistant principal's office and questioned behind closed doors regarding an ongoing investigation into vandalized bathrooms would have felt free to leave prior to being dismissed by the assistant principal. In response, the State asserts that the assistant principal was merely conducting a disciplinary investigation, which resulted in the imposition of school discipline.

The purpose of *Miranda* is to dispel the inherently coercive effect of police custody and interrogation. *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602. "[T]he special procedural safeguards outlined in *Miranda* are not required where a suspect is simply taken into custody, but rather where a subject in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). "Interrogation has been defined as a process of questioning by law enforcement officials which lends itself to obtaining incriminating statements." *S.D.*, 937 N.E.2d at 430. "Under *Miranda*, 'interrogation' includes express questioning and words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." *White v. State*, 772 N.E.2d 408, 412 (Ind. 2002) (citing *Innis*, 446 U.S. 301). The United States Supreme Court has held that the

safeguards outlined in *Miranda* also apply to the functional equivalent of interrogation by the police. *Innis*, 446 U.S. at 301-02.

[14] Whether a person is in custody depends upon objective circumstances, not upon the subjective views of the interrogating officers or the subject being questioned. *Gauvin v. State*, 878 N.E.2d 515, 520 (Ind. Ct. App. 2007), *trans. denied*. For an interrogation to be custodial in nature, one does not necessarily have to be under arrest. *S.D.*, 937 N.E.2d at 430. To be custodial in the non-arrest context, the interrogation must commence after the person's freedom of action has been deprived in a significant way. *Id.* This is determined by examining whether a reasonable person in similar circumstances would believe he is not free to leave. *Luna v. State*, 788 N.E.2d 832, 833 (Ind. 2003).

[15] While the determination as to whether a student is in custody and in need of *Miranda* safeguards is easily solved when the student is at the stationhouse, whether these same concerns that powered the *Miranda* decision are present in the modern schoolhouse setting is a more intricate question. This court previously provided a thorough analysis of the law concerning the issue in *S.G. v State*, 956 N.E.2d 668 (Ind. Ct. App. 2011), *trans. denied*, where we summarized prior Indiana cases that addressed the issue of whether a student was in custody when questioned at his or her school, including *State v. C.D.*, 947 N.E.2d 1018 (Ind. Ct. App. 2011); *G.J. v. State*, 716 N.E.2d 475 (Ind. Ct. App. 1999); and *S.A. v. State*, 654 N.E.2d 791 (Ind. Ct. App. 1995), *trans. denied, disapproved on other grounds by Alvey v. State*, 911 N.E.2d 1248, 1250 (Ind. 2009). In each case, the appellate court held that there was no *Miranda* violation. In

*S.A.,* we found that there "was no coercive atmosphere to protect against" where "the questioning took place in the school building, by the vice-principal, and a major portion of it occurred in the presence of the student's father." *S.G.* 956 N.E.2d at 677. In *G.J.*, juvenile G.J. was questioned by the dean in the dean's office regarding whether he had brought marijuana to school. *Id.* The record did not indicate if an officer was present in the dean's office during questioning. *Id.* In *C.D.,* a high school student was suspected of being "under the influence of some substance." *Id.* at 677. Following an investigation in the principal's office by a police officer, who was trained as a drug recognition evaluator, this suspicion was confirmed and C.D. was considered to be under the influence of marijuana. *Id.* at 677. A search of C.D.'s backpack by the principal revealed a controlled substance. *Id.* This court determined that the principal's action fell within the ambit of "an educational purpose" and that "C.D.'s examination was intended to carry out an educational function or school purpose, not to further a criminal examination." *Id.* at 677-78. Because the officer examined C.D. at the principal's request and in his presence, the investigation "did not transform [] into a custodial interrogation." *Id.* Nevertheless, since we issued *S.G.*, the educational landscape has undergone some significant changes.

[16] There can be no dispute that the task of safeguarding children in our schools and maintaining appropriate discipline is an issue of paramount public importance. Education is mandatory, and we entrust our children to the school system, believing that they will be in an environment that is clean, safe, and

conducive to learning. Every parent, indeed, all of society, expects this. However, "[w]alking the halls of America's public schools today, one should not be surprised to see a police officer." Paul Holland, *Schooling Miranda: Policing Interrogation in the Twenty-First Century Schoolhouse*, 52 Loy.L.Rev. 39, 1 (2006). In recent years, the presence of police in schools has changed more than just the frequency and nature of interactions between students and police and many schools have instituted 'zero tolerance' for school behavior. *Id.*; *See N.C. v. Com.*, 396 S.W. 3d 852, 863 (Ky. 2013). When viewed in protecting innocent children, this certainly has merit. But the use of zero tolerance has caused a dramatic shift away from traditional in-school discipline towards greater reliance on juvenile justice interventions. *N.C.*, 396 S.W.3d at 863. Such policies, which emphasize criminal charges, can serve to change the nature of questioning a student for purposes of school discipline into a criminal investigation. *Id.* In light of this changing educational landscape, school administrators have altered their activities to collaborate more actively with police officers. *Id.* In fact, school administrators in Indiana, under auspices of the Indiana Department of Education, as well as in several states across the country, are being instructed in law enforcement techniques of interviewing and interrogation.[2]

---

[2] On October 26, 2017, and November 9, 2017, the Indiana Department of Education advertised "training" in the Reid Technique of Interviewing and Interrogation for school administrators, with a focus on:

[17]     Just as a school cannot pretend ignorance of the rules of criminal procedure, neither can police officers ignore, as beyond their responsibility, the ways in which school administrators take advantage of their presence and actions. *See* Holland, *Schooling Miranda*, at 15. Police officers are not divested of their law enforcement authority when they enter schools; schools employ them precisely because they wield this authority. *Id*. at 17. As such, the presence of law enforcement in schools on a daily basis serves notice that crimes will be charged for conduct the officer believes violates the law. *N.C.*, 396 S.W.3d at 864. This is not inappropriate, but it does change the nature of questioning a child for school discipline purposes to an improper police interrogation absent constitutional safeguards. *Id*.

[18]     "[O]ther states have extended the concept of custody to school situations in which a school official, rather than a police officer, does the questioning, holding that the officer's pervasive presence can significantly increase[] the likelihood [that the student] would produce an incriminating response to the principal's questioning." *S.G.*, 956 N.E.2d at 678-79. In *N.C.*, the student admitted to giving hydrocodone to another student, in response to questioning by the assistant principal who was working in conjunction with the school resource officer. *N.C.,* 396 S.W.3d at 854. The officer was present during the

Reid Nine Steps of Interrogation: review the interrogation process, beginning with how to initiate the confrontation, develop the interrogational theme, stop denials, overcome objections, and use the alternative question to stimulate the admission.

INDIANA DEPARTMENT OF EDUCATION, http://www.doe.in.gov/safety/reid-technique-interviewing-and-interrogation-oct-26 (last visited Jan. 29, 2018).

discussion. *Id*. After the assistant principal informed N.C. that he was subject to school discipline, the assistant principal left the room, leaving N.C. with the officer. *Id*. The officer then informed N.C. that he would be charged with a crime. *Id*. At no time was N.C. advised that he was free to leave, was given *Miranda* warnings, nor were his parents called. *Id*. Recognizing that a proper balance has to be struck between "the important public policy concerns of educators and parents to provide an appropriate and safe school environment while still protecting the individual rights of a child," the Kentucky supreme court held that

> any statement obtained may not be used against a student as a basis for a criminal charge when law enforcement is involved or if the principal is working in concert with law enforcement in obtaining incriminating statements, unless the student is given the *Miranda* warnings and makes a knowing, voluntary statement after the warnings have been given.

> Every custodial interrogation, when law enforcement is involved will not necessarily invoke the giving of *Miranda* warnings, for example, if the matter purely concerns school discipline. There are many school disciplinary matters where the presence of the law enforcement officer will maintain order and create a safer environment for the administrator and student. However, statements obtained without giving *Miranda* warnings are subject to suppression if a criminal charge is brought.

> Certainly, all trained law enforcement officers know how to give *Miranda* warnings and to ensure that the school officer and the child are aware when criminal charges may be triggered. This is not an undue burden when measured against the consequences a child faces in the juvenile justice system or the adult criminal

system, which clearly can be punitive. And, this protection does not prevent a school official from filing a criminal complaint, though the voluntariness of any confession remains a question of law for the court in every case, even if *Miranda* warnings have been given.

*Id*. at 864, 865; *see also State v. Antonio T*., 352 P.3d 1172, 1179 (N.M. 2015); *In re K.D.L.*, 700 S.E.2d 766, 772 (N.C. Ct. App. 2010).

[19]  Turning to the facts before us, we conclude that D.Z. was submitted to a custodial interrogation at which he should have been advised of his rights pursuant to *Miranda*. The evidence establishes that after Dowler and Officer Flynn's investigation was complete and a suspect was identified, Dowler called D.Z. to his office for a discussion. The assistant principal questioned D.Z. in his office with the door closed. No reasonable student would have believed that he was at liberty to leave the office—it is undeniable that juveniles are susceptible to the influence of authority figures and the constraining effect of being in a controlled setting of a school, where "disobedience [can be] cause for disciplinary action." *J.D.B. v. North Carolina*, 564 U.S. 261, 276, 131 S.Ct. 2394, 2405, 180 L.Ed.2d 130 (2011). As such, the circumstances of a school setting— where a refusal to comply with the request or command of school officials can

have far-reaching consequences, including potential criminal charges—have become inherently more coercive recently than ever before in the past.[3]

[20] Although on its face appearing to be a school disciplinary proceeding, the 'discussion' between Dowler and D.Z. amounted in essence to an interrogation, geared towards a criminal proceeding. When Dowler reported the "mischief of vandalism and graffiti" to Officer Flynn and requested his assistance with the ongoing investigation, the school and law enforcement investigations became inextricably intertwined and Dowler was aware that criminal charges could ensue. (Tr. p. 17). In his office behind closed doors, Dowler explained the nature and method of the investigation to D.Z. After D.Z. made the incriminating statements, Dowler ended the conversation, imposed a five-day school suspension, and immediately informed Officer Flynn, who was waiting outside Dowler's office, of D.Z.'s admission. Without advising D.Z. of his *Miranda* rights, Officer Flynn proceeded to interrogate the student. Conceding that the officer should have *Mirandized* D.Z., the State now relies on D.Z.'s statements to the assistant principal as the basis to bring criminal charges against him. This sequence of events strongly suspects that the assistant principal and the officer were purposefully exploiting the school administrator's assumed ability to question without warnings and raises troubling echoes of the "confession-first" mode of interrogation found problematic by our United

---

[3] A student's fear of arrest for refusing to obey the directives of an authority figure at school is not unreasonable given the frequency with which school-based arrests for such refusals and other misconduct are documented in the mainstream media.

States Supreme Court in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).[4] If we no longer allow the *Seibert* interrogation technique in the stationhouse, why should we bless it in the schoolhouse?

[21]  Police officers cannot avoid their duty under *Miranda* by attempting to have someone act as their agent in order to bypass the *Miranda* requirements. *Sears v. State*, 668 N.E.2d 662, 668 (Ind. 1996), *overruled on other grounds Scisney v. State*, 701 N.E.2d 847 (Ind. 1998). All relevant factors indicate that D.Z. was in custody and deprived of his freedom. He was being interrogated by Dowler in an effort to elicit incriminating statements about vandalizing the restroom without being informed of his rights, and he confessed without full knowledge of the consequences for so doing. Because the assistant principal and Officer Flynn acted in concert in obtaining these incriminating statements, and both were aware of the probability of criminal charges, D.Z. should have been advised of his *Miranda* rights. Absent these warnings, the juvenile court abused its discretion in admitting D.Z.'s statements to the assistant principal. As a consequence, we conclude that the State cannot establish beyond a reasonable doubt that D.Z. committed criminal mischief, if committed by an adult. We reverse the juvenile court's finding of delinquency.

---

[4] In *Seibert*, the United States Supreme Court ruled that a police protocol to intentionally proceed without *Miranda* warnings until after an incriminating statement has been rendered, caused post-*Miranda* statements to be inadmissible. *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

# CONCLUSION

Based on the foregoing, we conclude that the juvenile court abused its discretion when it admitted D.Z.'s incriminating statements to a school official, who was working in cooperation with law enforcement.

Reversed.

Baker, J. concurs with separate concurring opinion

Brown, J. dissents with separate opinion

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D.Z.,<br><br>*Appellant-Respondent,*<br><br>v.<br><br>State of Indiana,<br><br>*Appellee-Petitioner.* | Court of Appeals Case No.<br>32A05-1708-JV-1907 |

**Baker, Judge, concurring.**

I fully concur with the majority opinion. I write separately to acknowledge the State's compelling argument that when D.Z. sat down with Dowler, it was merely a school disciplinary meeting that in no way implicated D.Z.'s *Miranda* rights. Historically speaking, there is truth in that argument. Unfortunately, I believe it ignores the reality of today's school hallways. The frequent—in some places, constant—presence of officers in our schools has, in my view, changed the nature of the school disciplinary process.

In this case, Dowler and Officer Flynn investigated the vandalism together. Together, they reviewed surveillance footage, conducted a methodical search of the boys' restrooms, and pinpointed D.Z. as the primary suspect. Dowler initially interviewed D.Z. without Officer Flynn. Immediately after that interview, however, Dowler informed Officer Flynn of the content of his conversation with D.Z., which ultimately led to an allegation that D.Z. was delinquent. Under these circumstances, and given the general evolution of the school disciplinary process into something quasi- (or actually) criminal in nature, I fully concur with the majority's determination that the finding of delinquency should be reversed.

# IN THE
# COURT OF APPEALS OF INDIANA

D.Z.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

Court of Appeals Case No.
32A05-1708-JV-1907

**Brown, Judge, dissenting.**

I respectfully dissent from the majority's conclusion that the court abused its discretion by admitting D.Z.'s statements to assistant principal Dowler when school resource officer Flynn was not present in the school office, and where there is no evidence that Dowler was acting as an agent of the police.

Ind. Code § 20-33-8-10 provides that a "principal may take action concerning the principal's school or a school activity within the principal's jurisdiction that is reasonably necessary to carry out or prevent interference with an educational

function or school purposes."[5] School purposes are defined as "the purposes for which a school corporation operates, including. . . [t]o promote knowledge and learning generally [and] [t]o maintain an orderly and effective educational system." Ind. Code § 20-33-8-4. D.Z.'s graffiti appeared in four different boys' bathrooms, made explicit reference to lewd sexual acts, and derogatorily targeted seventeen female students of the classes of 2017, 2018, and 2019, four or five with whom D.Z. had class. Unfortunately, pictures were taken of these messages and shared on social media and two girls found out that they were the subject of the graffiti before the school could remove it. Viewed from a schoolhouse perspective, D.Z.'s actions interfered with the maintenance of an orderly and effective educational system, Dowler's February and March investigation was an attempt to identify the cause of the interference, and his discussion with D.Z. was an attempt to restore order. *See Linke v. Northwestern Sch. Corp.*, 763 N.E.2d 972, 982 (Ind. 2002) ("However, a preventative or rehabilitative search conducted by a school corporation is substantively different than a search conducted to enforce the law. A preventative or rehabilitative search is inherent to a school corporation's function. Students generally understand that the 'preservation of . . . a proper educational environment requires close supervision' and thus the intrusion on privacy is less

---

[5] Educational function is defined as the "performance by a school corporation or its officers or employees of an act or a series of acts in carrying out school purposes." Ind. Code § 20-33-8-2.

severe.") (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 349-350, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)).

[30]     To the extent that the majority asserts that school and law enforcement investigations became "inextricably intertwined" or that Dowler's questioning amounted to an "interrogation, geared toward a criminal proceeding," the record does not indicate that Dowler acted as Officer Flynn's agent in an attempt to bypass any *Miranda* requirements. *See S.G. v. State*, 956 N.E.2d 668, 680 (Ind. Ct. App. 2011). *Cf. Sears v. State*, 668 N.E.2d 662, 668 (Ind. 1996) ("The purpose of *Miranda* is to dispel the inherently coercive effect of police custody and interrogation. Based on this rationale, it has also been held to apply to police custody and the functional equivalent of interrogation by the police. The police also cannot avoid their duty under *Miranda* by attempting to have someone act as their agent in order to bypass the *Miranda* requirements." (internal citations omitted)), *overruled on other grounds by Scisney v. State*, 701 N.E.2d 847 (Ind. 1998). Rather, the situation here is similar to that in *State v. C.D.*, where an investigation, first initiated by a school official, is subsequently assisted by a law enforcement officer, who is not independently investigating the matter. 947 N.E.2d 1018, 1023 (Ind. Ct. App. 2011) ("[Officer] Richhart was not independently investigating the matter. Instead, Richhart examined C.D. at [school official] Vanwanzeele's request and in Vanwanzeele's presence."). Here, only Dowler and academic coach Zack Baldwin took photographs of the graffiti. Dowler personally reviewed the video footage from specific days to identify "who was where" and took still images from the video.

Transcript Volume 2 at 54. He testified the investigation's "focus was finding out who was doing the graffiti," that he "went back to [the] date and time [of finding each graffiti] and ran through the video of the window and, sure enough, it had [D.Z] entering and exiting at the time the writing was not on the wall and the time the writing was on the wall," and that he called D.Z. in to have a discussion with him "once [he] had realized that [D.Z.] was a part of each video that [he] had went back and looked at." *Id.* at 54-55, 72-73. Dowler had spent many hours investigating the graffiti on his own before asking Officer Flynn to join him "a little bit before" March 15, 2017. *Id.* at 55. Officer Flynn testified that Dowler

> indicated that there had been graffiti – it was kind of on-going for several months and he had been investigating it, looking into it. The custodians would find it and let him know that it was found, and so, they had very broad time frames. So, when it came to me, he said hey, this has been on-going for a while and, so, I kind of stepped in at that point to help him narrow down that investigation and get some time frames that could be more helpful.

*Id.* at 17-18. When asked if he controlled the surveillance personally, set it up, or reviewed the videos afterwards on a regular basis, Officer Flynn testified, "I don't maintain it. I do review the videos frequently," and that he did not recall whether he discussed with Dowler the possibility that there could be criminal charges resulting from the graffiti. *Id.* at 19. Dowler also responded "[n]ot that I remember" when asked if "at any time while you were investigating the graffiti, did you discuss a criminal investigation." *Id.* at 55.

[31] When it came to speaking with then-seventeen-year-old D.Z., Dowler stated to Officer Flynn that he wanted to speak to D.Z. by himself because he "had a rapport with him" and wished to have the "conversation without [Officer Flynn] present." *Id.* at 43. Dowler questioned D.Z. at seventh period in his office with the door closed. *Id.* at 55-56. When asked if D.Z. was "free to leave your office during the discussion . . . [c]ould he have gotten up and walked out if he wanted to," Dowler answered, "I wouldn't have held him." *Id.* at 57. He testified similarly that D.Z. was allowed to go home with the other students when they were dismissed. When asked about the nature of the conversation in his office, Dowler testified:

> Yes. What I had, is I had first told [D.Z.] what I had seen. That I had been tracking some restroom graffiti and that I kind of zeroed in and had seen that he had been in some of the restrooms that the graffiti was found and that I had kinda closed the gap, so to speak, on when the graffiti was written and that I had video of him going into and coming out of those restrooms where the graffiti was not before in that little time frame that we had and, therefore, I knew that he was the one that was responsible for graffiti on the wall. At that moment, I kinda went into the question of is there a reason why you did this. Did you write this because you had hard feelings towards girls or something of that nature. His comment was no, I don't know why I did it. I didn't have anything against them of any sort. So, then it just became why would you do this and it became just a basic conversation of he really didn't have a reason and, so, I just kind of said okay, what you did was wrong so we're going to have to definitely take care of it. You know, we're gonna have to take care of it and work on it from here.

*Id.* at 61-62. Dowler explained to D.Z. that he faced a consequence of five days of suspension out of school. *Id.* at 63. Officer Flynn testified that he did not direct Dowler in any questioning, that when Dowler decided to bring in D.Z. for questioning, he was not in the office at the time of questioning, that he had a conversation with D.Z. after Dowler's conversation, and that he entered Dowler's office only after Dowler had exited, spoke to D.Z., and eventually let D.Z. know he was being charged.

[32] While it may be true that schools are different than they used to be, I would hold on these facts as this Court did in *C.D.*, 947 N.E.2d at 1022-1023; *S.G.*, 956 N.E.2d at 679-680; and *G.J. v. State*, 716 N.E.2d 475, 477 (Ind. Ct. App. 1999), and find that no *Miranda* violation occurred in the statements made to Dowler outside the presence of Officer Flynn and affirm the trial court's finding.